HOLLOWAY, Circuit Judge,
dissenting:
I
Ms. Jessica Chrysler was hired as a photographer or “performer” at the Little-ton, Colorado studio of Defendant-Appellee The Picture People, Inc. (the Employer). The manager who hired her had full knowledge of her deafness and the means by which she can communicate, and he also had the experience to fully understand the requirements of the job.
When Ms. Chrysler was given an opportunity to conduct a photo session, her performance was given high praise by the customers. She conducted a number of other sessions as well, and there is no evidence that these sessions were less than successful in any way. Nevertheless, acting on what a jury could well determine was nothing more than a stereotyped view of the limitations of the deaf, the Employer first relegated Ms. Chrysler to work only in the lab, then eliminated all of her hours, and finally, after months of hollow promises that she would be given some opportunities, it fired her. Not only that, but the Employer explicitly chastised Ms. *993 Chrysler for having the temerity to complain about her treatment.
The EEOC brought this case against the Employer alleging (1) that the Employer had discriminated against Ms. Chrysler because of her deafness[1] in violation of the Americans With Disabilities Act, 42 U.S.C. §§ 12101-12213 (2006) (ADA)[2]; and (2) that the Employer had retaliated against Ms. Chrysler “for her requests for accommodation and complaints of discrimination.” Despite substantial evidence that Ms. Chrysler had performed well, the district court granted summary judgment for the Employer, holding that Ms. Chrysler was unable to perform the “essential functions” of the job and thus was not a “qualified individual” entitled to the protection of the ADA. Thus, the judge concluded that she could not do that which she had in fact done. Moreover, although faced with the fact that Ms. Chrysler had been disciplined explicitly for invoking her rights, the district court nevertheless concluded that the EEOC had not produced enough evidence to defeat summary judgment on the retaliation claim.
The opinion affirms these illogical holdings. Like the district court, the opinion fails to apply the proper standard in evaluating the evidence. When the evidence is taken in the proper light, I am convinced that the judgment must be reversed. I therefore respectfully dissent.
II
A.
“We review a grant of summary judgment de novo, applying the same standard as the district court.” McKnight v. Kimberly Clark Corp., 149 F.3d 1125, 1128 (10th Cir.1998). Under Fed.R.Civ.P. 56, summary judgment should be entered by the district court “if the movant shows that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law.” On appeal,
[w]e examine the record to determine whether any genuine issue of material fact was in dispute; if not, we determine whether the substantive law was applied correctly, and in so doing we examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing the motion.
McKnight, 149 F.3d at 1128 (brackets and quotations omitted). Furthermore, in our review of the record we “must disregard all evidence favorable to the moving party that the jury is not required to believe.” Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 151, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).
Because the majority opinion fails even to acknowledge — much less to view in the favorable light as it should — much of the evidence that the EEOC submitted to the district court, it is necessary to survey that evidence in some detail. In keeping with our standard of review, the following recitation of the evidence will be focused on the EEOC’s evidence and should be understood as representing what a properly instructed, rational jury could find, based on that evidence. Testimony favorable to the Employer in this case comes mostly from its own employees, and the jury of course would not be required to accept their testimony. Therefore, that evidence should not be considered at this stage. Id. (not *994 ing that the courts should give credence to the evidence favorable to the moving party on summary judgment only if that evidence is “uncontradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses”).
B.
Ms. Chrysler is congenitally deaf. She communicates in American Sign Language (ASL), and with written notes, gestures, and facial expressions. She also can use a computer. Ill ApltApp. 593a. These methods work when she communicates with one person or a small group, but she needs a sign language interpreter for group settings such as the staff meetings held by the Employer during her brief tenure.
The Employer’s business is photography, and it specializes in portraits of children of age five and younger. Ms. Chrysler was hired on October 23, 2007, to work at the portrait studio in Littleton, Colorado, one of a number of the Employer’s branches. Ms. Chrysler was hired by Mr. Aguilar, who was then the manager of that studio. She was hired as a photographer, a position that the Employer calls “associate” or “performer.”
Performers had four general areas of responsibility: customer intake, sales, portrait photography, and laboratory duties. Mr. Aguilar intended to use Ms. Chrysler primarily in the “camera room” taking pictures. Mr. Aguilar had previously worked for the Employer in another location where he had worked with a deaf woman photographer, Ms. Duke, and Mr. Aguilar thought that Ms. Duke was very capable.
Ms. Chrysler was scheduled for an initial orientation and training program that the Employer requires for all new hires. One of the goals of the training is to transmit the Employer’s philosophy, which emphasizes not just the quality of the portraits it produces but also the quality of the customer’s experience. On being hired, Ms. Chrysler requested that an ASL interpreter be provided for the training session. Mr. Aguilar agreed that one was needed but had no idea how to arrange it. He contacted his district manager, Candi Bryan, about it. Ms. Bryan told Mr. Aguilar that the Employer did not provide such services. Aguilar and Chrysler each contacted Employer’s human resources department. A human resources official suggested that Mr. Aguilar check local churches for volunteer interpreters. A “Sr. Human Resources Mgr.” sent an email to the studio manager saying that hiring an interpreter “to be around the studio while this employee is working ... seems like an expense we would like to do without.” II ApltApp. 395a. Employer provided no other assistance to Aguilar as he attempted to make arrangements for an interpreter.[3]
The Employer’s failure to provide an interpreter (as noted, the Employer did not attempt to provide an interpreter) caused Ms. Chrysler’s start date to be delayed by three weeks. Eventually, Ms. Chrysler learned that the Colorado Division of Vocational Rehabilitation, which had been helping her in her job search, could provide interpreters for their clients’ initial training, and at Ms. Chrysler’s request this was done for her three days of initial training in mid-November 2007. Ms. Chrysler completed the training and was assigned to begin working in the camera room.
The day after completing the training, Ms. Chrysler had a photo session with the *995 Krol family and their infant. This went very well and the Krols were very pleased, so much so that they bought more pictures than they had planned to buy, III Aplt. App. 740a-741a, and returned the next month for another session.[4] At that time, they requested to work with Ms. Chrysler again but were told that she was not available. In fact, she was available but the Employer had relegated her to lab work only at that time.
Just three days after the Krols’ session with Chrysler, two managers visited the Littleton studio to conduct advanced training for the staff. Ms. Chrysler attended. She requested an interpreter, but none was provided. Consequently, she could not benefit from the training session. One of the managers providing the training contacted district manager Bryan to express concern about Chrysler. (Apparently the concern was not that Ms. Chrysler had not been provided an interpreter, but concern that she had been hired as a photographer.) The next day Ms. Bryan directed Mr. Aguilar to assign Ms. Chrysler to the lab. Mr. Aguilar demoted himself from studio manager to performer that same day (a decision which, Aguilar later testified, was not related to the direction regarding Ms. Chrysler). Management of the Littleton studio was assigned, temporarily, to assistant manager Kim Doyle, with Deidre Sandoval to be her assistant. The Employer directed them to assign Ms. Chrysler only to the lab.
Ms. Chrysler testified in her deposition that she had conducted as many as 15 to 20 photo shoots for the Employer, most with other employees present and “a couple” by herself. She said that district manager Bryan was with her during one session. Most significantly, she testified that no one ever expressed concern to her about how those sessions had been conducted. On appeal, the Employer has not identified any evidence that there was any deficiency in Ms. Chrysler’s performance during the times that she conducted photo sessions, and my search of the record has produced no such evidence.[5] Accordingly, a jury could conclude that the decision to assign Ms. Chrysler to work only in the *996 lab, where she would have no contact with customers, was based on nothing but stereotyped assumptions against the abilities of the deaf. This is what the ADA was intended to counter.
The studio occasionally held mandatory staff meetings. During the six weeks that Ms. Chrysler worked there, she requested an interpreter for the meetings, but none was ever provided. Instead, the Employer merely gave her a written outline or agenda. As a result, she was not able to benefit as intended from the discussions in the meetings.
The Employer’s business is seasonal. Ms. Chrysler had been hired as part of a pre-holiday expansion of the work force because Christmas is one of the busiest seasons. Immediately after Christmas, business slowed down dramatically at least until Valentine’s Day, with the result that most employees got substantially reduced hours. But Ms. Chrysler was never given another shift after Christmas Eve.
When Ms. Chrysler noticed that she was not listed on the first schedule to come out after Christmas, she complained to acting manager Doyle. Ms. Doyle told Ms. Chrysler she would love to have her on full-time but there simply was not enough work for anyone to get full-time assignments in January. In an exchange of written notes, Ms. Doyle told Ms. Chrysler she would try to find some shifts for her. Ms. Doyle then sent a message to district manager Bryan saying that Ms. Chrysler was “demanding hours” and “threatening discrimination.”[6] Ms. Doyle prefaced this message with three other complaints about Ms. Chrysler: she was “causing trouble arguing with the managers and trying to refuse to take a break”; she was coloring with colored pencils in the lab during work hours; and she had declined “a few opportunities to shoot” when the studio was really busy.[7]
District manager Bryan forwarded Ms. Doyle’s message to a representative of human resources. That person later testified that she thought the matter had been referred to her for discipline because she understood (or assumed), incorrectly, that management at the Littleton studio had communicated with Ms. Chrysler and that Chrysler had refused to change her behavior. That same day, district manager Bryan drafted a disciplinary notice for Ms. Chrysler. Although this was the first notice to Ms. Chrysler of any problem, the document was labeled a “final warning.” It reprimanded Ms. Chrysler first for refusing to take breaks and second for becoming angry and threatening to “bring a grievance” against the employer. II Aplt. App. 341a. Ms. Chrysler was also reprimanded for coloring in the lab.
In the disciplinary notice as later delivered to Ms. Chrysler was a message to Ms. Chrysler about her hours: “Due to the limited tasks that you are qualified to perform, we can only schedule you on very busy times with other groups of employees. There are not very many busy times in January.... If you want more hours, wait ‘till the next peak period, perhaps Valentine’s Day.” After that, Ms. Chrysler called the studio weekly to see if she had been scheduled for any shifts. Despite the suggestion in the notice that Ms. Chrysler might get more hours in the period before *997 Valentine’s Day, she never was given any work time after Christmas Eve in 2007.
On March 6, 2008, Ms. Chrysler filed a discrimination charge against the Employer with the EEOC. In its response to the charge, the Employer said that Ms. Chrysler had not been terminated and told the EEOC that it would contact Chrysler when business increased “so that she may be able to continue her employment,” and said that this might occur in the weeks before Father’s Day (which had previously proved to be a busy time for the studio). In May 2008, Ms. Chrysler visited the new manager of the Littleton studio about getting some shifts.
The Employer never contacted Ms. Chrysler, never gave her any more work, and formally terminated her in October 2008. These are the basic facts on the discrimination charge and the retaliation charge on which the district court ruled.
Ill
A.

The ADA coverage

In enacting the ADA, Congress stated, inter alia, that its purpose was “to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities.... ” 42 U.S.C. § 12101(b)(1). Congress found that individuals with disabilities experienced “restrictions and limitations ... resulting from stereotypic assumptions not truly indicative of the individual ability of such individuals to participate in, and contribute to, society....” 42 U.S.C. § 12101(a)(7).
Coverage under the ADA extends to one who is a “qualified person with a disability” and that in turn is defined as one who “with or without reasonable accommodation, can perform the essential functions” of the position in question. Therefore, a necessary first step is to identify the “essential functions” of the position. “Essential functions” are the fundamental duties, not the “marginal functions of the position.” Davidson v. America Online, Inc., 337 F.3d 1179, 1191 (10th Cir.2003). Determining whether a particular duty is “essential” is a factual inquiry based on a number of factors, including but not limited to the employer’s judgment as to what duties are essential and any written job description the employer prepared for the position. 42 U.S.C. § 12111(8); Davidson, 337 F.3d at 1191 (“Determining whether a particular function is essential is a factual inquiry.”).
But the employer’s judgment is not conclusive evidence. As this court has said, “an employer may not turn every condition of employment which it elects to adopt into a job function, let alone an essential job function, merely by including it in a job description.” Davidson, 337 F.3d at 1191. More specifically, we deal here with a purported “essential function” that the Employer now seeks to define in such a way as to eliminate an entire class of disabled persons — those who do not communicate well orally.[8]
The majority correctly notes the legal principles that establish when an employer may adopt such qualification standards. By statute, such a qualification standard may only be used when “consistent with business necessity.” 42 U.S.C. § 12112(b)(6), quoted in maj. op. at 985. The majority also correctly notes that an employer must make “reasonable accommodations” for an otherwise qualified person unless the employer can show that the *998 accommodation “would impose an undue hardship” on the employer’s operations. 42 U.S.C. § 12112(b)(6), quoted in maj. op. at 985.
The Employer’s primary contention is that the ability to communicate orally is an essential function of the position. The EEOC’s primary contention is that ability to communicate orally is a method by which most employees perform the essential function of communicating with the customers.
The Employer offered two job descriptions in its materials supporting its motion for summary judgment, one for the position of “performer” and one for the position of “seasonal associate.” Both listed as job duties making customers feel welcome and comfortable and providing customers with a variety of distinct portraits. The Employer’s witnesses gave similar descriptions of the job duties, such as: greet customers as they arrive and check them in at the front desk (intake); ascertain the kind of pictures the customer wants and take pictures that satisfy the customer, which includes communicating with the customer on desired poses (photography); develop pictures in the lab; and sell the customer a package of pictures (sales). Notably, none of these descriptions includes as a job duty a requirement of oral communication.[9] A jury could find from this evidence that oral communication is “a useful skill or method to perform the essential functions” of communicating with customers, but one that is “not in itself an essential function of the ... position.” See Skerski v. Time Warner Cable Co., 257 F.3d 273 280 (3d Cir.2001) (emphasis added). Significantly, Skerski noted that the legislative history of the ADA indicated that the “essential function requirement focuses on the desired result rather than the means of accomplishing it.” Id. (quoting 136 Cong. Rec. 11,451 (1990)).
The majority says that Ms. Chrysler “is unable to fully perform three of the four main duties of a performer.” Maj. op. at 986. Rejecting the EEOC’s evidence that Ms. Chrysler can communicate effectively using her alternative means, the majority further says that “nothing suggests that gestures, pantomime, and written communication are similarly effective and efficient for these tasks.” Id. at 986-87. I strongly disagree. Considerable evidence was produced from which a jury could determine that Ms. Chrysler could communicate effectively.
Most notably, there was evidence that Ms. Chrysler not only could but did communicate effectively and efficiently. First, there is the evidence of the photo session with the Krol family, discussed supra. Only by ignoring this clear example of Ms. Chrysler’s ability to perform the essential functions of photo shooting and sales can the majority find that “nothing suggests” that she could do that which she had in fact already done. Moreover, Ms. Chrysler conducted several other shoots, some by herself and some with another employee present. No evidence has been cited to us suggesting that there were any communication problems in conducting these sessions. Mr. Aguilar testified that he never received a complaint from a customer for whom Ms. Chrysler had taken photos. Ill Aplt-App. at 613a.
It appears that none of the employees who worked with Ms. Chrysler in photo *999 sessions testified; in any event, the Employer has not cited any record evidence that any of these persons observed deficiencies in her performance. Consequently, in the face of Ms. Chrysler’s testimony that she had conducted 15 to 20 photo sessions, there is no evidence of any resulting communication problems.[10]
As for the efficiency of the communication, again there is no evidence that any of Ms. Chrysler’s sessions were out of the ordinary in duration. Of course the Employer’s ultimate interest is sales. The only evidence in the record regarding Ms. Chrysler’s performance in this area comes from her manager, Mr. Aguilar, who testified that Ms. Chrysler made a “huge sale” to the Krol family, successfully selling the Krols more photos than they had originally planned to purchase. I Aplt.App. 96a; see also n. 4, supra, and accompanying text.
It is surely relevant also that Ms. Chrysler was, after all, hired by the branch’s manager, Mr. Aguilar, with full awareness of both the job requirements and Ms. Chrysler’s deafness. Mr. Aguilar had been with the Employer for some years and believed that Ms. Chrysler could perform the job. As noted, he had worked with a deaf performer in the past. A jury could find these facts highly relevant in determining whether the ability to communicate orally is indeed a business necessity.
The EEOC produced additional evidence of Ms. Chrysler’s abilities. Her vocational rehabilitation counselor, Ms. Barbara Bryant, testified, based on her experience in working with the disabled, that deaf persons can perform a job calling for strong customer service skills and oral communication skills by using gestures, notes and so forth. The counselor also testified that, based on her experience working with her, Ms. Chrysler could communicate with customers in the Employer’s setting and ensure that they had a pleasant experience. The EEOC’s vocational expert, Mr. Newman, also testified that Ms. Chrysler could perform the essential functions of the performer position with reasonable accommodation.
In sum, substantial evidence was presented from which a jury could determine that oral communication is not an essential function of the job but a method for performing the essential function of communication, and that Ms. Chrysler could perform the essential function of communication with or without reasonable accommodation. Thus the summary judgment against the EEOC on the discrimination claims was clearly unjustified.
B.

The Davidson precedent

In Davidson v. America Online, Inc., 337 F.3d 1179 (10th Cir.2003), as in this case, the employer “relied on [the job claimant’s] disability” as a reason for the challenged employment decision.[11] In *1000 both cases, the affected employee or prospective employee was deaf. We said there that if the employee or prospective employee “is in fact statutorily disabled, the determinative issue in the case will not be the employer’s intent, but whether the employee is ‘otherwise qualified,’ with or without reasonable accommodation, to perform the job, a factual dispute that is resolved through traditional methods of proof” 337 F.3d at 1189 (emphasis added).
In Davidson, as in this case, the decisive issue was whether the plaintiff was “otherwise qualified” for the position, i.e., whether he could, with or without reasonable accommodation, perform the essential functions of the position. As here, that key issue depended on whether the employer’s requirement related to an “essential function” of the job. And that is a fact question for the jury: “Determining whether a particular function is essential is a factual inquiry.” Id. at 1191 (emphasis added); see also Kellogg v. Energy Safety Services, Inc., 544 F.3d 1121, 1127-28 (10th Cir.2008) (holding, inter alia, that “the jury could properly have found that neither of [the employer’s] claimed job requirements was an essential function of Ms. Kellogg’s job.”); Bartee v. Michelin North America, Inc., 374 F.3d 906, 914 (10th Cir.2004) (issues on appeal included “whether the jury could have found” that employer’s requirements “are not essential functions” of the position at issue).
I am convinced that Davidson is directly on point and mandates reversal of the summary judgment in favor of the Employer. A jury must decide whether oral communication skills are an essential function of the job or only the manner in which most hearing employees perform the job. Indeed, I find it astonishing that on this record the district court and the majority rule as a matter of law that Ms. Chrysler could not perform the essential functions of the position when in fact the evidence that she could do so was considerably stronger than the minimum necessary to submit these factual questions to the jury.
A jury could determine that the Employer’s decisions were based on exactly the kind of stereotypes that the ADA was enacted to combat. Congress has codified its views on this point: “[P]hysical or mental disabilities in no way diminish a person’s right to fully participate in all aspects of society, yet many people with physical or mental disabilities have been precluded from doing so because of discrimination.” 42 U.S.C. § 12101. Moreover, lawsuits like Ms. Chrysler’s are precisely the mechanism Congress envisioned for correcting such injustice: “It is the purpose of [the ADA] ... to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities.” Id. (emphasis added). It is distressing that this court should affirm the ruling below, refusing to submit the issues to a jury and for it to do so without careful adherence to our duty to view the facts in the light most favorable to the party opposing summary judgment. I would reverse the judgment of the district court and hold that the claims of wrongful termination and failure to accommodate must be submitted to a jury.
C.

The retaliation claim

Ms. Chrysler’s claim of retaliation is even stronger than her claim of discrimination. The record shows that disciplinary action was initiated against Ms. Chrysler when she threatened to bring a grievance complaining of the Employer’s alleged discrimination on the basis of Chrysler’s deaf *1001 ness.[12] Such timing is, of course, a fact from which a jury could infer retaliatory motive. But here there is significantly more. Not only was discipline initiated when she asserted her rights; it was initiated because she asserted her statutory rights: The disciplinary notice she was given specifically reprimanded her for asserting her ADA rights!
In criticizing Ms. Chrysler’s actions, the Employer directly impugned her for the fact that she “became angry and threatened to bring a grievance.” II ApltApp. 341a. It is hard to imagine more direct proof of mistreatment for relying on her statutory rights. Direct evidence of retaliatory motive is evidence of pretext sufficient to require submission of the issue to the jury. See Crowe v. ADT Security Services, Inc., 649 F.3d 1189, 1196 (10th Cir.2011); Medlock v. Ortho Biotech, Inc., 164 F.3d 545, 551 (10th Cir.1999); Conner v. Schnuck Markets, Inc., 121 F.3d 1390, 1396 & n. 5 (10th Cir.1997); Randle v. City of Aurora, 69 F.3d 441, 453 (10th Cir. 1995). The majority’s startling holding here that direct evidence of retaliatory motive is insufficient to create a genuine issue of material fact is directly contrary to these precedents.
To overcome summary judgment on the issue of pretext, the majority correctly notes, “a plaintiff must present evidence of temporal proximity plus circumstantial evidence of retaliatory motive.” Maj. op. at 989. Both of these requirements are satisfied in this case. Yet the majority chooses to scrutinize additional evidence of retaliatory motive while ignoring the direct evidence of that motive, i.e., the fact that the Employer reprimanded Ms. Chrysler specifically for saying that she might pursue a remedy for the discriminatory treatment she had received. The fact that discipline was initiated because of protected activity, even if only partly because of that activity, is sufficient evidence for a jury to find retaliatory motive. See Conner, 121 F.3d at 1396 & n. 5. Moreover, the majority’s efforts to dismiss the additional, indirect evidence of pretext is unconvincing.
Ms. Chrysler was disciplined for conduct that others engaged in without repercussion. The district court discounted this evidence on the basis that the EEOC “provided no details about the other employees and their infractions that would allow a jury to conclude these employees were similarly situated to Chrysler.” Ill Aplt. App. 867. Ms. Chrysler testified that the other employees worked with her in the lab and engaged in the same conduct for which she was disciplined. At the summary judgment stage, I would hold that this is sufficient to raise an issue as to whether those other employees were situated similarly to Ms. Chrysler.
Moreover, there is considerable additional evidence that the Employer’s stated reasons were pretextual. The majority correctly notes that all (or at least most) employees had their hours reduced after the holiday season.[13] But Ms. Chrysler’s hours were totally eliminated — not just reduced — and not just in the period immediately following the holiday season but for ten months until she finally was terminated. There is no evidence that any other *1002 employee’s hours were “reduced” so drastically. Not only that, but the Employer repeatedly promised Ms. Chrysler that she would be given some work, promises which the Employer never fulfilled; indeed as far as this record reveals, the Employer never attempted to fulfill those promises.
The EEOC identified even more evidence of pretext in its briefs, such as the discrepancies between testimony of district manager Bryan and other witnesses. But with direct evidence of discriminatory motive and the evidence I have already noted, further discussion here is not necessary. If temporal proximity plus circumstantial evidence of retaliatory motive is sufficient — and the majority correctly says that it is — then how can temporal proximity plus direct evidence of retaliatory motive be insufficient? Our precedents say that it is sufficient. I strongly disagree with the majority’s holding that the retaliation claim may be rejected by a summary judgment.
Conclusion
The majority opinion fails to take the facts in the light most favorable to the EEOC as we are bound to do in the posture of this case, leading to the surreal conclusion that Ms. Chrysler is unable, as a matter of law, to perform the tasks that she had completed successfully. On the retaliation claim, the majority ignores direct evidence of retaliatory motive and incorrectly finds the remaining evidence insufficient.
In sum, I would reverse the district court and remand for a properly instructed jury to resolve the genuine issues of material fact that are presented here. Accordingly, I must respectfully but emphatically dissent.

. The complaint alleged three discrete discrimination claims: (1) failure to accommodate; (2) wrongful termination; and (3) hostile work environment. The EEOC does not appeal from the district court's grant of summary judgment to the Employer on the third claim.

. This lawsuit is based on events that occurred before the ADA was amended in 2008.

. The majority says that the Employer was "unable” to provide an interpreter, but the evidence reflects that the Employer never made any attempt to do so. Maj. op. at 984.

. This is presumably the occasion to which the majority refers when it says that Ms. Chrysler "attempted to conduct a shoot by herself....” Maj. op. at 984. This results from failure to adhere to the proper summary judgment standard of taking the evidence in the light most favorable to the party opposing summary judgment. Ms. Chrysler did not just "attempt” to conduct a shoot by herself— she did conduct this shoot by herself with a good result for both the Employer and the customers. Mr. Aguilar testified that Ms. Chrysler had made a “huge sale.” I Aplt. App. 96a.

. As noted in the majority opinion, the Employer’s brief cites testimony to the effect that Ms. Chrysler’s alternative modes of communication would be "simply impractical” in the camera room. This evidence might be sufficient to create an issue of fact such that summary judgment in favor of the EEOC would not have been proper. But it cannot do more.
As I note in the text of this dissent, in reviewing this summary judgment in favor of the Employer, we are bound to disregard evidence favorable to the Employer "that the jury is not required to believe.” Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 151, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Moreover, the Employer’s brief, in the passage quoted in the majority opinion, cites in support of its statements the deposition testimony of three witnesses, none of whom testified to having observed any of Ms. Chrysler’s photo sessions. (Ms. Chrysler testified that Ms. Bryan had observed one session, but Ms. Bryan testified that she observed Ms. Chrysler only in a class.) A jury could decide that the concerns expressed by these witnesses were based on predetermined ideas of the limits of the deaf. But in the posture of this appeal, this panel should disregard this evidence because a jury would not be required to accept it rather than the evidence presented by the EEOC.

. The latter was meant to say that Ms. Chrysler was threatening to complain of discrimination, as Ms. Doyle testified in her deposition. Ill Aplt.App. 704a-706a.

. This complaint that Ms. Chrysler had declined opportunities to conduct photo sessions is puzzling, but I find nothing in the record to explain why Ms. Chrysler declined opportunities, and neither party bases any argument on this evidence.

. As discussed in the text infra, the EEOC’s position is that oral speech is a job qualification, but not necessarily an "essential function."

. The job descriptions (one for "seasonal associate” and one for "performer”) listed "strong verbal communication skills” as a "job qualification,” not as a duty. I Aplt.App. 99, 101. Both parties seem to accept that "verbal communication” in this instance was meant to convey "oral communication,” which is the usage adopted in the majority opinion as well.

. The Employer's scant evidence should in any event be disregarded in view of the summary judgment posture of this appeal, because a rational jury could find Ms. Chrysler’s evidence on this point more credible than the Employer’s. The resulting conclusion that naturally follows such a credibility finding would be that the Employer’s decisions were based only on stereotyped assumptions about what Ms. Chrysler could do, rather than on actual observations of how she had in fact performed. See n. 5, supra.

. In Davidson, the plaintiff had applied for a job in the employer's customer service call center in Utah. The employer staffed the call center with "voicephone” and "non-voice-phone” positions. Plaintiff applied for a nonvoicephone position, which a deaf person could perform. But the employer required for that position experience in a voicephone position. This requirement, like Picture People’s purported requirement that performers have oral communications skills, effectively disqualified all deaf applicants.

. Ms. Chrysler’s supervisor wrote a message saying that Ms. Chrysler was “threatening discrimination," but no one disputes that this confusing language referred to Ms. Chrysler raising the issue of the Employer's discriminatory behavior. Ill Aplt.App. 704a-706a.; supra n. 6.

. The majority also cites Ms. Chrysler’s supposed inability to perform all of the functions of the job to excuse the Employer’s actions. I have already explained my disagreement with that thesis.